**HUESTON HENNIGAN LLP**
Moez M. Kaba, State Bar No. 257456
mkaba@hueston.com
Mariah N. Rivera (*pending admission pro hac vice*)
mrivera@hueston.com
Alexander R. Perry (*pending admission pro hac vice*)
aperry@hueston.com
1 Little W 12th Street, 2nd Floor
New York, NY 10014
Telephone: (646) 930-4046
Facsimile: (888) 775-0898

*Attorneys for Plaintiffs/Movants*

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UMG RECORDINGS, INC., CAPITOL RECORDS, LLC, and SONY MUSIC ENTERTAINMENT<br><br>Movants,<br><br>vs.<br><br>BOND CAPITAL MANAGEMENT, LP<br><br>Third Party. | Case No.: 3:26-mc-80304<br><br>[RELATED TO CASE NO. 1:24-CV-11611 (FDS) PENDING IN THE DISTRICT OF MASSACHUSETTS] |
| UMG RECORDINGS, INC., CAPITOL RECORDS, LLC, and SONY MUSIC ENTERTAINMENT<br><br>Plaintiffs,<br><br>vs.<br><br>SUNO, INC., and JOHN DOES 1-10,<br><br>Defendant. | |

**PLAINTIFFS' NOTICE OF MOTION AND MOTION TO COMPEL BOND CAPITAL MANAGEMENT, LP TO PRODUCE DOCUMENTS RESPONSIVE TO RULE 45 SUBPOENA; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**

**NOTICE OF MOTION AND MOTION TO COMPEL**

Please take notice that Plaintiffs UMG Recordings, Inc., Capitol Records, LLC, and Sony Music Entertainment (collectively, "Plaintiffs") will and hereby do move, pursuant to Rules 34 and 45 of the Federal Rules of Civil Procedure, for an Order Compelling Compliance with the Subpoena served on Bond Capital Management, LP ("Bond"). This motion is brought pursuant to Rules 34 and 45 of the Federal Rules of Civil Procedure on the grounds that Bond has failed to provide relevant, non-privileged documents responsive to the subpoena served on it.

This Motion is based on this Notice of Motion and Motion to Compel Bond's Compliance with the Subpoena, the accompanying Memorandum of Points and Authorities, the Declaration of Alexander R. Perry and accompanying exhibits, all pleadings and papers on file herein, and such further evidence and argument as may be presented at or before the hearing on this Motion.

**CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 37-1**

Pursuant to Civil Local Rule 37-1(a), Plaintiffs certify that, before filing this Motion, their counsel conferred with counsel for Bond for the purpose of attempting to resolve all disputed issues, including through direct dialogue during a meet-and-confer by videoconference on October 6, 2026, see Civil L.R. 1-5(n), and through written correspondence, and that those efforts did not resolve the dispute. See Declaration of Alexander R. Perry ("Perry Decl.") ¶¶ 13–19.

## TABLE OF CONTENTS

**Page(s)**


I. INTRODUCTION ........ 1

II. BACKGROUND ........ 3

A. The Underlying Action ........ 3

B. Investor Discovery in the Underlying Action ........ 3

C. The Subpoena to Bond Capital and the Parties' Conferral ........ 4

III. LEGAL STANDARD ........ 5

V. ARGUMENT ........ 6

A. The Requested Documents Are Highly Relevant to the Central Issues in This Case ........ 7

1. The Requested Documents Are Relevant to Suno's Fair Use Defense ........ 7

2. The Requested Documents Are Also Relevant to Suno's Willful Infringement ........ 9

3. Bond's Reliance on Visto and SARA Is Misplaced ........ 10

B. The Requests are Proportional to the Needs of the Case ........ 13

C. At Minimum, the Court Should Order Bond to Produce the Offered Communications ........ 15

V. CONCLUSION ........ 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508 (2023) .......... 7

*Apple, Inc. v. Samsung Elecs. Co.*, 2013 WL 1942163 (N.D. Cal. May 9, 2013) .......... 6

*Callwave Commc'ns, LLC v. Wavemarket, Inc.*, 2014 WL 2918218 (N.D. Cal. June 26, 2014) .......... 5

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994) .......... 8

*Gonzales v. Google, Inc.*, 234 F.R.D. 674 (N.D. Cal. 2006) .......... 6

*In re UMG Recordings, Inc. v. Uncharted Labs, Inc.,* (*a16z* Order), No. 4:25-mc-80194-KAW, Order re Motion to Compel, (N.D. Cal. Sept. 9, 2025), Dkt. 28 .......... *passim*

*In re Williams-Sonoma, Inc.*, 947 F.3d 535 (9th Cir. 2020) .......... 6

*Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340 (1978) .......... 6

*Sci. Applications & Rsch. Assocs. (SARA), Inc. v. Zipline Int'l, Inc.*, 2024 WL 3925704 (N.D. Cal. Aug. 23, 2024) .......... 10, 11, 12

*Sony BMG Music Ent. v. Tenenbaum*, 660 F.3d 487 (1st Cir. 2011) .......... 9

*Thomson Reuters Enter. Ctr. GmbH v. ROSS Intel. Inc.,* — F.4th —, 2026 WL 2932557 (3d Cir. Sept. 29, 2026) .......... 8

*Unicolors, Inc. v. Urb. Outfitters, Inc.*, 853 F.3d 980 (9th Cir. 2017) .......... 9

*Viacom Int'l, Inc. v. YouTube, Inc.*, 2008 WL 3876142 (N.D. Cal. Aug. 18, 2008) .......... Passim

*Visto Corp. v. Smartner Info. Sys., Ltd.*, 2007 WL 218771 (N.D. Cal. Jan. 29, 2007) .......... 10, 11, 12, 13

**Statutes**

17 U.S.C. § 107 ........ 1, 7, 8

17 U.S.C. § 504 ........ 9

28 U.S.C. § 84(a) ........ 6

**Rules**

Fed. R. Civ. P. 26 ........ 5

Fed. R. Civ. P. 34 ........ 1, 2, 6

Fed. R. Civ. P. 45 ........ 1, 2, 4, 6, 14

**MEMORANDUM OF LAW AND POINTS OF AUTHORITIES**

Pursuant to Rules 34(c) and 45(d)(2)(B)(i) of the Federal Rules of Civil Procedure, Plaintiffs respectfully move to compel non-party Bond Capital Management ("Bond") to comply with a subpoena issued pursuant to Rule 45 (the "Subpoena"), which seeks the production of documents relevant to central issues in the underlying copyright infringement action, pending in the District of Massachusetts.

## I. INTRODUCTION

In or around April 2026, nearly two years into the underlying copyright infringement action, Bond Capital Management, LP led Suno, Inc.'s ("Suno") Series D funding round, which raised more than $400 million at a $5.4 billion valuation. *See* Ex. 1 (Suno's Series D Announcement).[1] Bond did so knowing that Plaintiffs UMG Recordings, Inc., Capitol Records, LLC, and Sony Music Entertainment (collectively, "Plaintiffs") had accused Suno of "willful copyright infringement on an almost unimaginable scale," to train generative AI models that "risk[] overrunning the market with AI-generated music." First Am. Compl. ¶¶ 7, 8, 12, *UMG Recordings, Inc. v. Suno, Inc.*, No. 24-cv-11611-FDS (D. Mass.) (the "Underlying Action"), Dkt. No. 277. A sophisticated venture firm like Bond does not lead a nine-figure round in a defendant that is facing mass copyright infringement liability without evaluating those claims, the training practices that gave rise to them, and the market the company intends to capture. That evaluation, and what Suno told Bond to secure its capital, are what Plaintiffs seek. This information bears directly on: (1) Suno's fair use defense, which turns on the commercial character of Suno's use and its effect on the market for Plaintiffs' recordings, 17 U.S.C. § 107(1), (4); and (2) whether Suno's continuing exploitation of Plaintiffs' copyrighted works is willful, *id.* § 504(c)(2). And because Bond assessed Suno in 2026, with this lawsuit pending, its files capture Suno's current market trajectory and Suno's account of its own exposure, information uniquely in Bond's possession.

---

[1] Unless otherwise specified, all citations to exhibits refer to the documents appended to the Declaration of Alexander R. Perry in Support of Plaintiffs' Motion to Compel Bond Capital Management, LP.

This is not a novel request. Last year, a court in this District compelled materially identical discovery from a16z, the lead investor in Udio, another generative-AI music company sued by these same Plaintiffs, holding that "[i]nformation about Udio's market and its actual or potential impact on the music industry goes to its dilutive effect on the market and is thus relevant," and that the investor's conclusory burden and confidentiality objections did not outweigh that relevance given the protective order in place. *UMG Recordings, Inc. v. Uncharted Labs, Inc.*, No. 25-mc-80194-KAW, Dkt. No. 28 at 4–7 (N.D. Cal. Sept. 9, 2025) ("a16z Order") (Public Redacted Version) (Ex. 2). The Magistrate Judge presiding over the Underlying Action has likewise declined Suno's request for a protective order to bar discovery from Suno's Series D investors, explaining that he did not "get why investors in Suno would be irrelevant to a consideration of what is Suno's anticipated or ongoing behavior in the marketplace," and that what Suno told investors when it pitched them is "the kind of thing that I do think plaintiffs are entitled to explore." Ex. 3 (Aug. 26, 2026 Tr.) at 25:12-15, 31:10-11; *see* also Ex. 4 (Suno Motion for Protective Order).

Consistent with that guidance, Plaintiffs narrowed the subpoena to Bond to four categories of Suno-specific materials: (1) Bond's investment memoranda and committee materials concerning Suno; (2) its due diligence on Suno, including non-privileged analyses of legal and litigation risk; (3) its notes of meetings and calls with Suno; and (4) its internal analyses of Suno's market and impact on the music industry, all subject to redaction of unrelated portfolio companies and the protective order in the Underlying Action. Ex. 5 (M. Rivera Oct. 7, 2026 Email). To date, Bond offered to produce its communications with Suno on three subjects but refuses to produce any of its own internal materials, *Id.* (P. Gunn Oct. 7, 2026 Email), without identifying any specific burden, Ex. 6 (Bond Responses and Objections to Subpoena); Perry Decl. ¶ 20. The Court should compel Bond to produce documents responsive to the Narrowed Requests and, at a minimum, to produce promptly the communications it has already agreed to collect.

## II. BACKGROUND

### A. The Underlying Action

Plaintiffs are among the world's largest record companies. They filed the Underlying Action against Suno in the District of Massachusetts on June 24, 2024, alleging that Suno built its

commercial AI music-generation service by copying Plaintiffs' copyrighted sound recordings on a massive scale and ingesting those copies to train the models that power its product to generate outputs that compete with the very recordings Suno used to train. First Am. Compl. ¶¶ 7-8, 12. The operative complaint asserts claims for direct copyright infringement and circumvention of technological protection measures in the acquisition of Plaintiffs' copyrighted works (which Suno stream-ripped from YouTube). Suno's principal defense is fair use. Chief Magistrate Judge Paul G. Levenson has supervised discovery in the Underlying Action.

**B. Investor Discovery in the Underlying Action**

How Suno describes its business, its training data, and its intended market to the investors funding it has been a recognized subject of discovery from the outset in the Underlying Action. When Suno resisted producing its investor communications in early 2025, Judge Levenson stated that he was "having trouble understanding why the pitch to investors is either burdensome or irrelevant," observing that investors "must have been thinking about the intersection between technological innovation and" market "disruption." Ex. 7 (Feb. 14, 2025 Tr.) at 15:1-9. Suno thereafter agreed that it would not "carve out from discovery documents that would be responsive to [Plaintiffs'] RFPs and hit upon agreed-upon search terms just simply because they have an investor in the loop." Ex. 8 (Apr. 17, 2025 Tr.) at 22:4-8. By its own account, Suno has since produced its investor communications from December 2022 through February 2025, its investor decks for every funding round, and a corporate designee to testify about the Series D deck. Ex. 4 (Suno Motion for Protective Order) at 2.

Plaintiffs also served document subpoenas on several of Suno's earlier investors, each of which produced documents after negotiation without motion practice. Ex. 3 (Aug. 26, 2026 Tr.) at 14:22-15:9, 17:16-18:5. Those productions were modest in volume, fewer than 300 documents from each of the three largest, *id.* at 17:25-18:3, but they yielded evidence Suno itself had not produced. *See id.* at 30:16-31:3. Judge Levenson described that example as "the kind of thing that is more likely found when you ask people what did they say when they showed you the pitch deck," and as "the kind of thing that I do think plaintiffs are entitled to explore." Ex. 3 at 31:1-11.

On June 3, 2026, Suno announced that it had closed its Series D round, raising more than $400 million at a $5.4 billion valuation, with Bond as lead investor. Ex. 1. The round "ran from

November 2025 through June 2026," Ex. 4 at 2, after the period covered by Suno's production of investor communications and after every prior investor subpoena. On July 31, 2026, Plaintiffs served subpoenas on seven Series D investors, including Bond, seeking the same categories of materials the earlier investors had produced. Ex. 9; Ex. 4 at 1–2. Suno moved for a protective order barring all discovery from the Series D investors, arguing that materials from a round closed "more than a year after Plaintiffs filed suit" could not be relevant. Ex. 4 at 2. Plaintiffs opposed. At an August 26, 2026 conference, Judge Levenson declined to enter a protective order. He rejected the premise that investors in Suno "would be irrelevant to a consideration of what is Suno's anticipated or ongoing behavior in the marketplace," Ex. 3 at 25:12-15, identified investors' notes and records of what Suno told them as the appropriate focus, *id.* at 22:21-24, 31:1-11, and directed Plaintiffs to work with subpoena recipients on "practical ways of making compliance manageable," *id.* at 7:11-15.

### C. The Subpoena to Bond Capital and the Parties' Conferral

Plaintiffs served Bond with a Rule 45 subpoena on July 31, 2026, with a return date of August 14, 2026, designating a place of compliance in San Francisco. Ex. 9 at 2. On August 13, Bond served objections and responses stating, as to each of the subpoena's eleven requests, that it "will not produce documents in response to this Request." Ex. 6 at 5–16. Bond's objections asserted in general terms that the requests were "overbroad, overly burdensome," and sought confidential information, *id.*, and that "it defies logic that Bond could have any documents relevant to this Action, given that the Action was filed in 2024 and Bond did not invest in Suno until years later," *id.* at 2 (Gen. Obj. 3).

Plaintiffs requested a conference with Bond's counsel on August 28, 2026, two days after the conference before Judge Levenson regarding Suno's request for a protective order. Ex. 5. Bond's counsel did not respond. Plaintiffs renewed the request on September 30, Bond's counsel replied on October 2 offering dates the following week, and the parties conferred by videoconference on October 6. *Id.*; Perry Decl. ¶¶ 14–16. The next day, Plaintiffs proposed to narrow the subpoena to four categories of Suno-specific materials: (1) Bond's investment memoranda and committee materials concerning Suno; (2) its due diligence on Suno, including non-privileged analyses of legal, regulatory, or litigation risk; (3) its notes and debriefs of meetings and calls concerning the

investment; and (4) its internal analyses of the market for Suno's service and Suno's impact on the music industry. Ex. 5 (M. Rivera Oct. 7, 2026 Email). Plaintiffs agreed that Bond could redact information about unrelated portfolio companies, provided Bond with the protective order entered in the Underlying Action, and confirmed that any production would be governed by it. *Id.*

Bond rejected the proposal that evening. It declined to produce any of its "internal, proprietary, and sensitive diligence memos, summaries, presentations, and the like," asserting that such materials are "core to its business" and that Plaintiffs must make "a threshold showing of substantial need." Ex. 5 (P. Gunn Oct. 7, 2026 Email). Bond offered instead to produce "any and all communications between Suno and Bond" concerning "(1) the Suno market opportunity and/or impact of Suno on existing music publishers including but not limited to UMG, (2) the legal risks attendant to Suno's business, and/or (3) the UMG v. Suno litigation." *Id.* On October 12, Plaintiffs accepted that offer as a partial resolution, without waiver, asked Bond to begin collecting those communications, and requested confirmation by October 13 that the offer was not conditioned on Plaintiffs abandoning the remaining categories. Ex. 5 (A. Perry Oct. 12, 2026 Email). As of the time of this filing, Bond did not confirm. Perry Decl. ¶ 19. Under the scheduling order in the Underlying Action, the deadline to raise this discovery dispute is October 14, 2026. Underlying Action, Dkt. No. 284.

## III. Legal Standard

"The scope of the discovery that can be requested through a subpoena under Rule 45 is the same as the scope under Rule 26(b)." *Callwave Commc'ns, LLC v. Wavemarket, Inc.*, 2014 WL 2918218, at *2 (N.D. Cal. June 26, 2014). Rule 26(b), in turn, permits discovery of "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). Relevance under this standard remains broad, encompassing "any matter that bears on, or that reasonably could lead to other matter that could bear

on, any issue that is or may be in the case." *In re Williams-Sonoma, Inc.,* 947 F.3d 535, 539 (9th Cir. 2020) (quoting *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 350–53 (1978)).

A non-party may be compelled to produce any materials falling within this broad scope. Fed. R. Civ. P. 34(c), 45; *see Apple, Inc. v. Samsung Elecs. Co.*, 2013 WL 1942163, at *3 (N.D. Cal. May 9, 2013) ("Third-party status does not confer a right to obfuscation or obstinacy."). In assessing a non-party subpoena, "a court determining the propriety of a subpoena balances the relevance of the discovery sought, the requesting party's need, and the potential hardship to the party subject to the subpoena." *Gonzales v. Google, Inc.*, 234 F.R.D. 674, 680 (N.D. Cal. 2006); *accord* a16z Order at 2. The non-party resisting discovery bears the burden on hardship, and a subpoena may be quashed or modified as unduly burdensome "only if the third party shows an undue burden with 'specific examples or articulated reasoning.'" a16z Order at 6. A motion to compel a non-party's compliance with a subpoena is properly filed in the district where compliance is required. Fed. R. Civ. P. 45(d)(2)(B)(i).[2]

## IV. ARGUMENT

Plaintiffs move to compel production in response to Request Nos. 2, 3, 4, 5, 6, and 11 of the Subpoena, as narrowed through the parties' conferral.[3] Bond responded to each request by asserting materially identical objections premised on relevance, burden, overbreadth, confidentiality, availability in party discovery, and, in certain instances, that the information is more appropriate for expert discovery. *See* Ex. 6 at 5-16. On the basis of those objections, Bond stated as to every request that it "will not produce documents in response[.]" *Id.*

To address Bond's overbreadth and burden objections, Plaintiffs narrowed the requests to the following four categories (the "Narrowed Requests"):

> **Narrowed Request No. 1 (encompassing served Requests Nos. 3 and 6):** Any draft investment memoranda, opportunity summaries, and investment committee presentations, minutes, or approval materials

---

[2] The subpoena to Bond designates a place of compliance at 57 Post Street, San Francisco, California, Ex. 9, which lies within this District, 28 U.S.C. § 84(a).

[3] Each request at issue in this motion, followed by Bond's response, is set forth in full in Exhibit 6.

concerning the investments in Suno.

> **Narrowed Request No. 2 (encompassing served Requests Nos. 4 and 5):** Due diligence materials concerning Suno, including diligence reports, expert or reference-call notes, market studies, and non-privileged analyses of legal, regulatory, or litigation risk.

> **Narrowed Request No. 3 (encompassing served Requests Nos. 2 and 3):** Notes, summaries, or debriefs memorializing meetings or calls with Suno personnel or anyone else discussing the actual or potential investments in Suno.

> **Narrowed Request No. 4 (encompassing served Requests Nos. 6 and 11):** Internal analyses or projections concerning the market for Suno's service or its actual or potential impact on the music industry, including valuation analyses or models supporting the Series D price.

Plaintiffs also seek, within served Request Nos. 2 and 4, the communications between Suno and Bond concerning Suno's market opportunity and impact on the music industry, the legal risks of Suno's business, and this litigation, which Bond has agreed to produce (the "Offered Communications"). Ex. 5 (P. Gunn Oct. 7, 2026 Email). Bond's objections to each are addressed below.

These requests seek documents that are highly relevant to Suno's fair use defense and to the willfulness of its infringement, and they are proportional to the needs of the case.

### A. The Requested Documents Are Highly Relevant to Central Issues in This Case

#### *1. The Requested Documents Are Relevant to Suno's Fair Use Defense*

Suno bears the burden of proving fair use. *See Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 547 n.21 (2023). Two of the four statutory fair use factors turn on facts about Suno's business that Bond, as lead investor in its most recent funding round, was uniquely positioned to learn and record. Each of the Narrowed Requests is directed at those facts.

The first fair use factor asks whether the infringing use is commercial and "'whether *and to what extent'* the use at issue has a purpose or character different from the original." *Warhol*, 598 U.S. at 528–29 (citation omitted); 17 U.S.C. § 107(1). Where "an original work and a secondary use share the same or highly similar purposes, and the secondary use is of a commercial nature, the first factor is likely to weigh against fair use[.]" *Warhol*, 598 U.S. at 532-33. Plaintiffs allege that Suno's purpose of copying the copyrighted works is the same as the original: to generate music that substitutes for

the recordings on which it trained. First Am. Compl. ¶¶ 7, 12. How Suno described its purpose to the investor leading its Series D round, including whether it presented its product as a competitor to and replacement for Plaintiffs' recordings or the platforms on which those recordings are consumed, is direct evidence on this factor. That is what Narrowed Request No. 3 (notes of meetings and calls with Suno) and Narrowed Request No. 1 (investment memoranda reflecting Bond's understanding of Suno's strategy) seek. Earlier investor productions in the Underlying Action show that this is not speculation: investors' internal records have captured what Suno's founders said about its data sourcing and competitive ambitions in terms that appear nowhere in Suno's own production. Ex. 3 at 30:16–31:3.

The fourth factor inquires into "the effect of the use upon the potential market for or value of the copyrighted work[,]" 17 U.S.C. § 107(4), including "'whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market' for the original." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 590 (1994). In the first appellate decision to apply fair use principles to a defendant that copied copyrighted works to train an AI system, the Third Circuit framed that inquiry not only around "harm to the original market," but also on "harm to the value of the copyrighted work, harm to the potential derivative market, and the alleged public benefits of the copying." *Thomson Reuters Enter. Ctr. GmbH v. ROSS Intel. Inc.,* — F.4th —, 2026 WL 2932557, at *8 (3d Cir. Sept. 29, 2026). Bond's analyses of the market for Suno's service and Suno's "actual or potential impact on the music industry" (Narrowed Request No. 4), its diligence on Suno's market position (Narrowed Request No. 2), and its records of what Suno represented about its licensing plans and its announced intention to release a model "developed in partnership with the music industry" (Narrowed Request No. 3) go to each component of the fourth-factor analysis. They are especially probative here because Suno has told the court in the Underlying Action that it intends to argue that the training-data licensing market is "circular" and "not legally recognizable." Ex. 10 (Mar. 12, 2026 Tr. at 8:9–10). What Suno told its lead investor about that market while raising capital is the best evidence of what Suno actually believes it to be. And because Bond evaluated Suno in 2026, its assessment reflects the market as it stands after two

years of Suno's rapid growth—not the early-stage projections captured by the prior investor productions and Suno's previous productions, making it even more probative.

A court in this District has already held that materially identical investor discovery is relevant to these two factors. In the a16z Order, the court found that information about Udio's "market and its actual or potential impact on the music industry goes to its dilutive effect on the market and is thus relevant" to the fourth factor, and that discovery into how Udio's "business plan is premised on exploiting Plaintiffs' copyrighted works to create an AI product that produces audio files which will compete with the works on which it was trained" is relevant to the first. a16z Order at 4–5. Chief Magistrate Judge Paul G. Levenson, who is supervising discovery in the Underlying Action, has reached the same conclusion as to investor discovery from Suno in party discovery. Judge Levenson rejected the suggestion that Suno's investors "would be irrelevant to a consideration of what is Suno's anticipated or ongoing behavior in the marketplace," Ex. 3 at 25:12-15, and identified investors' notes of what Suno said in response to "the kinds of things investors might reasonably ask about on the pitch deck" as "the kind of thing that I do think plaintiffs are entitled to explore," *id.* at 31:1-11. Judge Levenson had earlier observed, when Suno resisted producing its own investor pitch, that investors "must have been thinking about the intersection between technological innovation and" market "disruption." Ex. 7 (Feb. 15, 2025 Hr'g Tr.) at 15:1-9.

*2. The Requested Documents Are Also Relevant to Suno's Willful Infringement*

Plaintiffs seek enhanced statutory damages for willful infringement, 17 U.S.C. § 504(c)(2), which requires proof that Suno "had knowledge that [its] actions constituted copyright infringement or acted with reckless disregard for the copyright holder's rights." *Sony BMG Music Ent. v. Tenenbaum*, 660 F.3d 487, 507–08 (1st Cir. 2011); *accord Unicolors, Inc. v. Urb. Outfitters, Inc.*, 853 F.3d 980, 991 (9th Cir. 2017). A defendant's state of mind "is not publicly available data and may not be clear from documents produced by defendants[,]" and investors with a close relationship to the defendant "may have obtained information regarding defendants' intent and knowledge through oral communications, which respondents then incorporated into their internal analyses." *Viacom Int'l, Inc. v. YouTube, Inc.*, 2008 WL 3876142, at *4 (N.D. Cal. Aug. 18, 2008); *see also* a16z Order at 3–4 (compelling investor discovery on this basis).

Bond objects that it "did not invest in Suno until years" after this action was filed. Ex. 6 at 2. Contrary to Bond's suggestion, this timing *enhances* the relevance of the information Plaintiffs seek. Suno's infringement did not cease when Plaintiffs sued. Rather, Suno has continued to exploit Plaintiffs' copyrighted sound recordings by using them to train new models and improve its AI product, all with full knowledge of Plaintiffs' claims. An investor leading a multi-hundred million dollar funding round in Suno in 2026 necessarily asked about those claims, and Suno necessarily answered. What Suno told Bond about its training practices, its exposure in this litigation, and any changes it made to how it sources data, as well as Bond's records and analyses of those conversations, is direct evidence of Suno's knowledge and of whether its continued conduct reflects a good-faith belief in its lawfulness or a calculated acceptance of risk. Bond itself has seemingly recognized as much by offering to produce its communications with Suno concerning "the legal risks attendant to Suno's business" and "the UMG v. Suno litigation." Ex. 5 (P. Gunn Oct. 7, 2026 Email). This is not enough. Narrowed Request No. 2 (non-privileged diligence on legal and litigation risk) and Narrowed Request No. 3 (notes of meetings and calls with Suno) seek the *internal records* of these exchanges, which are often the only record of what the defendant said orally. *See Viacom*, 2008 WL 3876142, at *4; *see also* a16z Order at 3–4.

*3. Bond's Reliance on Visto and SARA Is Misplaced*

Bond's refusal to produce any internal information rests on *Visto Corp. v. Smartner Info. Sys., Ltd.*, 2007 WL 218771 (N.D. Cal. Jan. 29, 2007), and *Sci. Applications & Rsch. Assocs. (SARA), Inc. v. Zipline Int'l, Inc.*, 2024 WL 3925704 (N.D. Cal. Aug. 23, 2024). Ex. 5 (P. Gunn Oct. 7, 2026 Email). The a16z court considered both decisions on a materially identical record, found them distinguishable, and compelled production. a16z Order at 3–5. They are distinguishable here for the same reasons.

*First*, *Visto* and *SARA* were both patent cases in which the subpoenaing party sought an investor's internal valuations as evidence of commercial success or damages. In *Visto*, the court found "no reason to believe that [the investor] possesses any such information not publicly available or available in the documents produced by Visto, or that [its] opinions and analysis are independently relevant" to those issues. 2007 WL 218771, at *4. In *SARA*, the movant "never tie[d] that argument

to any damage theory or claim or defense." 2024 WL 3925704, at *5. The a16z court read those decisions as holding that an investor's valuation analysis, offered on damages, is "more akin to expert reports" and therefore not independently relevant, and it agreed that the relevance of investor discovery "to damages appears more questionable." a16z Order at 3, 5–6. But it held that the same discovery was relevant to fair use, because "information about the market for Udio's services and its actual or potential impact on the music industry go to fair use," and it compelled production on that basis. *Id.* at 5–6. Plaintiffs do not seek Bond's materials as a substitute for expert analysis of damages. They seek them because Suno has put its own purpose and its own market effect at issue by pleading fair use, and the Narrowed Requests are directed at Suno's representations on those subjects and Bond's contemporaneous assessment of them. *See supra* Section IV.A.1.

*Second, Visto* and *SARA* turned on the absence of any reason to believe the investor held information that was not "publicly available or available in the documents produced by" the party. *Visto*, 2007 WL 218771, at *4; *see also* a16z Order at 3. The materials sought here are different in kind. Narrowed Request Nos. 1, 3, and 4 seek documents Bond authored, namely its investment memoranda, notes of meetings and calls with Suno's management, and internal analyses of Suno's market and competitive position. Suno is not in possession of these documents. Nor are they the equivalent of what Suno did provide. Suno's pitch decks reflect what Suno chose to put in writing during the course of an active litigation, while Bond's notes would have recorded what Suno said when asked about its pitch. And Bond's internal memoranda would have recorded Bond's reasoned conclusions based on all the available information. Judge Levenson drew precisely this distinction, explaining that Plaintiffs are not seeking investors' "copies of a standardized deck" but whether anyone took "notes" or "capture[d] information that may have been provided in connection with the deck," Ex. 3 at 22:21-24, and that evidence of what Suno's founders told an early investor about its data sourcing was "the kind of thing that is more likely found when you ask people what did they say when they showed you the pitch deck," *id.* at 31:1-3. This is the rationale the a16z court relied on in accepting *Viacom*'s premise that investors with a close relationship to the defendant "may have obtained information regarding defendants' intent and knowledge through oral communications, which respondents then incorporated into their internal analyses." a16z Order at 4 (quoting *Viacom*,

2008 WL 3876142, at *4). Bond's relationship to Suno is the kind of close relationship that makes this situation analogous to *Viacom*. As lead investor, Bond conducted the diligence and negotiated the terms that produced a $5.4 billion valuation while this litigation was pending. *See* Ex. 1. The internal record of Bond's exchanges with Suno, and what Bond made of them, are solely in Bond's possession.

*Third,* the posture is different. In *SARA* the investors had already "produced their memoranda documenting the reasons for their investments" and the movant sought "more," 2024 WL 3925704, at *4; in *Visto*, the plaintiff in the litigation had already produced all the documents "made available to investors" in connection with the funding at issue, and the movant seeking to enforce a third-party investor subpoena had not substantiated the argument that the investor should nevertheless produce documents "merely as a means of verifying" the plaintiff's production, 2007 WL 218771, at *3. Here, by contrast, Suno's production of investor communications ends in February 2025, months before its Series D round began, Ex. 4 at 2, and Bond has produced nothing.

Bond's remaining response is that a16z held a board seat and an advisory role, whereas Bond is a minority investor without such a role in the company's management. Ex. 5. But the a16z court did not announce a board-seat requirement for investor-related discovery. It distinguished *Visto* and *SARA* because a16z was "not . . . a mere passive investor, whose only role was deciding whether or not to invest," a16z Order at 4, and the discovery it compelled under the fourth factor rested on the relevance of the investor's market information, not on board membership, *id.* at 5. A lead investor is not a passive one. Bond set the terms on which Suno raised more than $400 million, which required it to engage with Suno's management and other actual or potential investors, Suno's business plan, and its litigation exposure in a way distinct from a participant who merely writes a check. Ex. 1. *Viacom*, on which the a16z court relied, compelled production from all three investor respondents, including the one the court described as "the least involved[,]" because that investor had "already produced relevant documents not found in the more than one million pages produced by defendants." 2008 WL 3876142, at *3. The operative question is whether the investor is likely to hold relevant information the party does not. For the reasons stated above, Bond is likely to hold uniquely relevant information.

**B. The Requests are Proportional to the Needs of the Case**

The requests are also proportional to the needs of the case and Rule 26(b)(1)'s proportionality factors weigh decisively in favor of production. The issues at stake are the central contested questions in a case of immense importance to the music industry, and the discovery goes directly to the defense on which Suno has staked its case. *See supra* Section IV.A.1. The Narrowed Requests are confined to four categories of documents concerning a single investment, each a discrete and readily identifiable set of records in the ordinary course of a venture firm's business. Plaintiffs do not seek documents about Bond's other investments or its business generally, have agreed that Bond may redact information concerning other portfolio companies, and have confirmed that production will be governed by the protective order in the Underlying Action and the attendant confidentiality tiers. *Id.*

Against that, Bond has offered nothing. A non-party resisting a subpoena must show undue burden with "specific examples or articulated reasoning." a16z Order at 6. Bond's objections assert, in identical language for each request, that it is "overbroad, overly burdensome, and imposes undue expense on non-party, Bond." Ex. 6 at 5–16. Its counsel's correspondence adds nothing more specific. Ex. 1. In the a16z Order, the court rejected an investor's burden objection supported by a "conclusory assertion that a search would 'undoubtedly . . . be in excess of 100 hours'" because the investor "provide[d] no convincing details in support." a16z Order at 6. Bond has not offered even an estimate as to how long it would take to search for these discrete categories of information, which Plaintiffs designed to avoid a custodial collection. And Bond has already agreed to identify and collect its communications with Suno on three subjects, Ex. 5 (P. Gunn Oct. 7, 2026 Email), which confirms that its Suno-related files are accessible and that searching them is feasible.

Bond's objection that the requested documents are "more appropriately obtained from" Suno, Ex. 6 at 5, fails for the reasons set out above. Narrowed Request Nos. 1, 3, and 4 seek documents Bond authored and Suno never possessed, and Narrowed Request No. 2 seeks Bond's diligence file, which by its nature includes material Bond gathered from sources other than Suno. *See supra* Section IV.A.3. In any event, "there is no general rule that plaintiffs cannot seek nonparty discovery of documents likely to be in defendants' possession." *Viacom*, 2008 WL 3876142, at *3; *see Visto*, 2007

WL 218771, at *3 (production from a third party is appropriate where "the files of the third party may contain different versions of documents, additional material, or perhaps, significant omissions"). Bond's related objection that the requests seek information "more appropriate for expert discovery" because "Bond is not and will not serve as an expert in this case," Ex. 6 at 7, misapprehends what is sought. Plaintiffs do not ask Bond to serve as an expert or to prepare anything new. They seek only materials and analyses Bond already prepared in the ordinary course of its business when deciding whether to invest. Those documents record what Suno told its lead investor in 2026 and what that investor concluded at the time, and no retained expert can recreate either.

Nor does Bond's confidentiality objection justify withholding production. Bond asserts that its diligence materials are "sensitive, proprietary, and never shared outside the four walls of the firm." Ex. 5. The a16z court rejected the same objection because "there is a protective order in this case" and the investor offered "no suggestion . . . that the protective order is inadequate to ensure that its information remains protected." a16z Order at 6–7. The same is true here. Plaintiffs provided Bond with the operative protective order, which permits designation of material as attorneys' eyes only, and confirmed that Bond's production would be governed by it. Ex. 5. Bond has not identified any respect in which the existing protective order is inadequate.

Finally, Bond's assertion that Plaintiffs must make "a threshold showing of substantial need," Ex. 5, does not change the analysis. That standard appears in Rule 45(d)(3)(C), which governs a motion to quash or modify a subpoena that requires disclosure of "a trade secret or other confidential research, development, or commercial information[.]" Fed. R. Civ. P. 45(d)(3)(B)(i), (C). Bond has filed no such motion, and generalized assertions of confidentiality do not establish that the material falls within the rule. Even if it did, Plaintiffs' need is substantial and cannot otherwise be met: the materials bear on the central defense that is likely to decide the Underlying Action, and the records of what Suno told Bond, and of what Bond concluded, exist only at Bond. *See supra* Sections IV.A.1, IV.A.3.

### C. At Minimum, the Court Should Order Bond to Produce the Offered Communications

On October 7, Bond offered to produce "any and all communications between Suno and Bond, either before or after Bond's investment," concerning Suno's market opportunity and its impact on the music industry, the legal risks of Suno's business, and this litigation. Ex. 5 (P. Gunn Oct. 7, 2026 Email). Plaintiffs accepted that offer as a partial resolution of the Subpoena and asked Bond to begin collecting the documents. Ex. 5 (A. Perry Oct. 12, 2026 Email). As of the time of this filing Bond has not confirmed whether this offer was conditioned on Plaintiffs' abandoning the remainder of the Subpoena. Perry Decl. ¶ 19. Bond's offer confirms that, at that point, it did not consider production of those documents to be unduly burdensome. A non-party may not withhold documents it has offered to produce as leverage against the remainder of a subpoena. The communications fall within Request Nos. 2 and 4, and every argument Bond has advanced against the Subpoena is directed at Bond's internal materials rather than its correspondence with the defendant. Plaintiffs therefore request that, whatever the Court's disposition of the Narrowed Requests, it order Bond to produce the Offered Communications, together with any attachments and a log of any documents withheld as privileged, within 14 days of the Court's order.

## V. CONCLUSION

Bond chose to lead a $400 million funding round for a company that had been accused for two years of illegally building its business on Plaintiffs' copyrighted recordings. What Suno told Bond to secure that investment, and what Bond concluded about Suno's market and its exposure, are evidence relevant to the questions that will decide the Underlying Action (*i.e.*, whether Suno's use is commercial and substitutive, what effect it has on the market for Plaintiffs' works, and whether Suno nonetheless proceeded with knowledge of the consequences). A court in this District compelled the same discovery from Udio's lead investor on the same reasoning, and the Magistrate Judge supervising the Underlying Action has identified these records as the kind Plaintiffs are entitled to explore. Bond has offered no specific burden and there is a protective order available to address its confidentiality concerns.

For the foregoing reasons, Plaintiffs respectfully request that the Court order Bond to (1) produce all non-privileged documents responsive to the Narrowed Requests, subject to redaction of information concerning unrelated portfolio companies and designation under the protective order in the Underlying Action, and (2) produce the Offered Communications, with attachments and a privilege log, within 14 days of the Court's order.

Dated: October 14, 2026

By: ______________________

Moez M. Kaba
Mariah N. Rivera*
Alexander R. Perry*
**HUESTON HENNIGAN LLP**
1 Little West 12th Street
New York, New York 10014
Telephone: (646) 930-4046
Facsimile: (888) 775-0898
mkaba@hueston.com
mrivera@hueston.com
aperry@hueston.com

Rajan S. Trehan
**HUESTON HENNIGAN LLP**
523 West 6th Street, Suite 400
Los Angeles, California 90014
Telephone: (213) 788-4340
Facsimile: (888) 775-0898
rtrehan@hueston.com

Christina V. Rayburn
**HUESTON HENNIGAN LLP**
620 Newport Center Drive, Suite1300
Newport Beach, CA 92660
Telephone: (949) 229-8640
Facsimile: (888) 775-0898
crayburn@hueston.com

*Counsel for Plaintiffs/Movants*
**Pending admission pro hac vice*